IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DEREK CARRIER, et al.,

    Plaintiffs,

      v.

RAVI ZACHARIAS INTERNATIONAL
MINISTRIES, INC.
a 501(2)(3) Corporation, et al.,

    Defendants.

CIVIL ACTION FILE
NO. 1:21-CV-3161-TWT

## OPINION AND ORDER

This is an action for charity fraud. It is before the Court on Defendant Margaret Zacharias's Motion to Dismiss [Doc. 44] and Defendants Ravi Zacharias International Ministries, Inc. and RZIM Productions, Inc.'s Motion to Dismiss [Doc. 45]. For the reasons set forth below, the Court GRANTS in part and DENIES in part Defendant Margaret Zacharias's Motion to Dismiss [Doc. 44] and Defendants Ravi Zacharias International Ministries, Inc. and RZIM Productions, Inc.'s Motion to Dismiss [Doc. 45].

## I.   Background

The Court accepts the facts alleged in the First Amended Complaint[1] as true for purposes of the motions to dismiss. *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1122 (11th Cir. 2019). Ravi Zacharias was a well-known Christian

---

[1] All citations to the "Complaint" in this Opinion and Order refer to the First Amended Complaint [Doc. 37].

apologist and evangelical minister who founded the eponymous Ravi Zacharias International Ministries, Inc. (collectively, with RZIM Productions, Inc.,[2] "RZIM") in 1984. (Compl. ¶ 18.) Christian apologetics is a branch of theology devoted to defending the Christian faith through an evidence-based or "more philosophical and propositional" approach; the aim is "to fortify the believer against personal doubts and to remove the intellectual stumbling blocks that inhibit the conversion of unbelievers." (*Id.* ¶ 17 (citation omitted).) Built on this "strong evangelistic and apologetic foundation," RZIM describes its mission as "to support, expand, and enhance the preaching and teaching ministry of Ravi Zacharias . . . intended to touch both the heart and the intellect of the thinkers and opinion-makers of society with the Truth of the Gospel of Jesus Christ." (*Id.* ¶ 18 (citation omitted).) In the same vein, the organization's stated "vision" is "to build a team with a fivefold thrust of evangelism, apologetics, spiritual disciplines, training, and humanitarian support." (*Id.* ¶ 21 (citation omitted).)

---

[2] Ravi Zacharias International Ministries and RZIM Productions are Georgia non-profit corporations with their principal place of business in Alpharetta, Georgia. (Compl. ¶ 14-15.) RZIM Productions' registered purposes include "serving the needs and interests of, performing certain functions of, and otherwise carrying out the purposes of and advancing and perpetuating the ministry and missions of Ravi Zacharias International Ministries, Inc., as well as making distributions to or for the use of organizations exempt at the time under Section 501(c)(3) of the Code." (Compl. ¶ 15.) Unless stated otherwise, the Court (like the Complaint) refers to Ravi Zacharias International Ministries and RZIM Productions collectively as RZIM.

RZIM works toward this vision through conferences, lectures, and seminars held around the world; it also produces podcast and radio shows as well as online videos which featured Zacharias until his death on May 19, 2020. (*Id.* ¶¶ 21, 25, 35, 46.) For many years, these programs found a dedicated audience in the Plaintiffs: Dora and Derek Carrier listened to the "Let My People Think" podcast and watched YouTube videos of Zacharias from early 2019 until his death in 2020, and Elizabeth Nelson listened to Zacharias's radio shows for about 15 years and the "Let My People Think" podcast since 2014 or 2015. (*Id.* ¶¶ 25, 30-31.) Mrs. Nelson would also discuss Zacharias's Christian apologetics preaching and mission with her husband Chris Nelson. (*Id.* ¶¶ 30-31.) Over time, the Carriers "came to believe they were hearing teachings of the Gospel from a moral, righteous, and humble Christian leader." (*Id.* ¶ 25.) The Nelsons likewise considered Zacharias and RZIM to be "spiritually aligned with the Gospel of Jesus Christ and . . . completely dedicated to a mission of spreading the Gospel, teaching new apologists, and trying to help people through humanitarian efforts." (*Id.* ¶ 38.)

While listening to RZIM's programs, the Plaintiffs recall hearing Zacharias and other speakers solicit donations to RZIM. (*Id.* ¶¶ 27, 28, 30-31, 33.) For example, the Carriers specifically remember a July 4, 2020 "Let My People Think" episode which included the following message:

> The vision of RZIM is built on five pillars made up of evangelism, apologetics, spiritual disciplines, training, and humanitarian support. A fundamental part of this mission is to train men and

> women to defend the power and coherence of the Gospel of Jesus
> Christ. Our hope is to empower you to engage in earnest
> conversations with those who have questions about the Christian
> faith. Your donations make it possible for us to continue to reach
> others with the gospel and we cannot do this work without your
> help.

(*Id.* ¶ 27.) Similarly, Mrs. Nelson listened to a November 15, 2017 "Just

Thinking" episode which explained that

> [t]he goal of RZIM is to touch both the heart and the intellect of
> thinkers and influencers in our society. And this is accomplished
> by combining evangelism and apologetics. We aim to help reach
> students on college campuses and universities, encourage
> churches, and answer questions from Christians and skeptics. To
> find out more about our ministry or to donate, visit our website at
> RZIM.org.

(*Id.* ¶ 33.) The Plaintiffs heeded these calls for donations, with the Carriers

giving $30,000 to RZIM on January 21, 2020, and the Nelsons giving a total of

$5,422.50 between June 2014 and December 2020. (*Id.* ¶¶ 11, 13.) Both couples

allege that they "reasonably relied on Zacharias's and RZIM's uniform

messaging that they were dedicated to a mission of Christian apologetics and

that contributions made by people like the [Plaintiffs] would be used to

financially support that mission." (*Id.* ¶ 38; *see also id.* ¶ 28.)

According to the Complaint, though, Zacharias "was not who he claimed

to be" but was instead "a serial sexual and spiritual predator and a prolific sex

offender" since at least October 2014. (*Id.* ¶ 40.) Zacharias invested in and

frequented two health spas—Touch of Eden and Jivan Wellness—which were

operated, one after the other, at the same Alpharetta location starting in 2004.

(*Id.* ¶ 41.) Nearly two dozen therapists at the spas have reported inappropriate, sexual behavior by Zacharias during massages, including nudity, maintaining an erection, asking therapists to touch his genitals, and groping. (*Id.*) One witness described her many encounters with Zacharias over the years as rape. (*Id.*) Allegedly, Zacharias would demand sex from women after providing for their financial needs and sometimes used religious expressions to gain compliance—for example, referencing godly men in the Bible who had more than one wife. (*Id.* ¶ 42.) In 2017, a woman named Lori Ann Thompson reported inappropriate communications and interactions with Zacharias directly to RZIM leadership. (*Id.* ¶ 43.) When Zacharias claimed innocence and threatened to leave the organization, RZIM "steadfastly defended" Zacharias and declined to investigate Thompson's allegations despite receiving "a notebook of evidence." (*Id.* ¶ 44 (citation omitted).)

The Plaintiffs continued making contributions to RZIM while it defended Zacharias and he remained the organization's leader. (*Id.* ¶ 45.) The Complaint asserts that

> RZIM's actions and failure to respond appropriately to reports of Zacharias's sexual misconduct furthered the public deception that Zacharias was a faith-filled, moral, and upstanding Christian leader. RZIM's acts and omissions further allowed Zacharias to continue sexually abusing women under the cover of Christian ministry and permitted Zacharias's ongoing, deceptive fundraising efforts for RZIM.

(*Id.*) On September 29, 2020, a few months after Zacharias's death, *Christianity Today* published an article revealing sexual misconduct

allegations by three women. (*Id.* ¶ 47.) Following the article, RZIM hired a law firm, Miller & Martin PLLC, to investigate these and other accusations levied against Zacharias. (*Id.* ¶ 48.) The Miller & Martin Report, which RZIM made public on or about February 9, 2021, revealed that some women did not come forward with their stories earlier out of fear no one would believe them. (*Id.* ¶ 49.) It also found that Zacharias funneled RZIM funds to his victims: he gave them large tips after massages, showered them with expensive gifts, and provided monthly financial support through "Touch of Hope," a discretionary RZIM fund earmarked for humanitarian efforts. (*Id.* ¶ 50.) In one instance, Zacharias paid $40,000 for a woman's culinary education. (*Id.*) He also traveled with a personal massage therapist paid for by RZIM. (*Id.*)

The Plaintiffs allege that "[a]t no point prior to February 2021 did anyone at RZIM inform [them] that contributed funds were also used to further serious sexual misconduct or to cover up that misconduct." (*Id.* ¶ 39.) They would not have donated to RZIM, the Complaint continues, "had they been aware of these facts and of Zacharias's moral failings." (*Id.*) RZIM has since admitted its "failures in 2017, including its failure to commission an independent investigation at that time, allowing tremendous pain to continue." (*Id.* ¶ 51 (citation and alterations omitted).) In the Complaint's words,

> Zacharias's heinous acts as a sexual predator are diametrically opposed to the morality he espoused in his sermons and other public speaking engagements, are diametrically opposed to the teachings of Christianity, and are abhorred by Christian apologetics, of which he claimed to be a member and spiritual

6

> leader. Zacharias was not alone in perpetrating the fraud and deceit of faith-filled Christians. RZIM, itself, has acknowledged that its founder's sexual misconduct and RZIM's initial response to early allegations were not aligned with what RZIM held itself out to be.

(*Id.* ¶ 52.) In a video posted to RZIM's website but later removed, RZIM CEO Sarah Davis states that Zacharias was "not living up to the truth of what God is," and that, "while we were proclaiming a God who loves and values every person, our leader was not living into truth, and to the truth of who God is." (*Id.* ¶ 53 (citation and alteration omitted).)

The Plaintiffs initiated this class action on August 4, 2021, against RZIM and Margaret Zacharias, in her capacity as administrator of Zacharias's estate (the "Estate"). They allege that the Defendants "bilked hundreds of millions of dollars from well-meaning contributors who believed RZIM and Zacharias to be faith-filled Christian leaders," when "[i]n fact, Zacharias was a prolific sexual predator who used his ministry and RZIM funds to perpetrate sexual and spiritual abuse against women." (*Id.* ¶ 2.) To that end, the proposed class includes "[a]ll persons in the United States who made contributions of monetary value to Ravi Zacharias and/or the Ravi Zacharias International Ministry from 2004 through February 9, 2021." (*Id.* ¶ 55.) The Complaint asserts three claims, on behalf of the Plaintiffs and the proposed class, against the Defendants: violation of the Georgia Charitable Solicitations Act (Count I), unjust enrichment (Count II), and violation of the Georgia Fair Business Practices Act (Count III). The Estate and RZIM now move separately to

dismiss all of the claims against them.

## II.   Legal Standard

A complaint should be dismissed under Rule 12(b)(6) only where it appears that the facts alleged fail to state a "plausible" claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); Fed. R. Civ. P. 12(b)(6). A complaint may survive a motion to dismiss for failure to state a claim, however, even if it is "improbable" that a plaintiff would be able to prove those facts; even if the possibility of recovery is extremely "remote and unlikely." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). In ruling on a motion to dismiss, the court must accept the facts pleaded in the complaint as true and construe them in the light most favorable to the plaintiff. *See Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp., S.A.*, 711 F.2d 989, 994-95 (11th Cir. 1983); *see also Sanjuan v. American Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994) (noting that, at the pleading stage, the plaintiff "receives the benefit of imagination"). Generally, notice pleading is all that is required for a valid complaint. *See Lombard's, Inc. v. Prince Mfg., Inc.*, 753 F.2d 974, 975 (11th Cir. 1985). Under notice pleading, the plaintiff need only give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests. *See Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. at 555).

### III.   Discussion

**A. Ecclesiastical Abstention Doctrine**

First, the Defendants contend that this Court lacks subject matter jurisdiction to adjudicate the many ecclesiastical questions raised in the Plaintiffs' claims. (RZIM's Br. in Supp. of RZIM's Mot. to Dismiss, at 5-12; Estate's Br. in Supp. of Estate's Mot. to Dismiss, at 14-16.) The Eleventh Circuit has long recognized a "prohibition on judicial cognizance of ecclesiastical disputes" under the Establishment and Free Exercise Clauses of the Constitution. *Eglise Baptiste Bethanie De Ft. Lauderdale, Inc. v. Seminole Tribe of Fla.*, 824 F. App'x 680, 682-83 (11th Cir. 2020) (quoting *Crowder v. Southern Baptist Convention*, 828 F.3d 718, 721 (11th Cir. 1987)). "By adjudicating religious disputes, civil courts risk affecting associational conduct and thereby chilling the free exercise of religious beliefs. Moreover, by entering into a religious controversy and putting the enforcement power of the state behind a particular religious faction, a civil court risks establishing a religion." *Myhre v. Seventh-Day Adventist Church Reform Movement Am. Union Int'l Missionary Soc'y*, 719 F. App'x 926, 928 (11th Cir. 2018) (quotation marks omitted).

Out of these concerns has arisen the ecclesiastical abstention doctrine, which forbids courts to hear "matters involving theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them." *Eglise Baptiste*, 824 F.

9

App'x at 683 (quotation marks omitted). Still, the Supreme Court and the Eleventh Circuit have "rejected an absolute rule that civil courts are powerless to resolve any church property dispute." *Crowder*, 828 F.2d at 721 (collecting cases). Courts may apply a "neutral-principles approach" in cases that "involve[] no consideration of doctrinal matters," relying "exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges." *Jones v. Wolf*, 443 U.S. 595, 603 (1979); *see also Myhre*, 719 F. App'x at 928. Although the neutral-principles approach is particularly well suited to property cases, there is no "authority or reason precluding courts from deciding other types of church disputes by application of purely secular legal rules, so long as the dispute . . . can be decided without resolving underlying controversies over religious doctrine." *Puri v. Khalsa*, 844 F.3d 1152, 1165 (9th Cir. 2017) (quotation marks omitted).

The Plaintiffs argue, as a threshold matter, that the ecclesiastical abstention doctrine should be treated not as a jurisdictional issue but as an affirmative defense. (Pls.' Br. in Opp'n to RZIM's Mot. to Dismiss, at 7.) They cite *Hosanna-Tabor Evangelical Lutheran Church & School v. Equal Employment Opportunity Commission*, 565 U.S. 171 (2012), for support. There, the Supreme Court clarified that the "ministerial exception"—which is related to but distinct from ecclesiastical abstention, *Gregorio v. Hoover*, 238 F. Supp. 3d 37, 46 (D.D.C. 2017)—"operates as an affirmative defense to an otherwise cognizable claim, not a jurisdictional bar." *Hosanna-Tabor*, 565 U.S.

10

at 195 n.4. Since *Hosanna-Tabor*, though, the Eleventh Circuit has continued
to evaluate ecclesiastical-abstention issues under the Rule 12(b)(1) framework.
*See Eglise Baptiste*, 824 F. App'x at 683 (affirming dismissal for lack of
jurisdiction "because the dispute was strictly and purely ecclesiastical in its
character") (quotation marks omitted); *Myhre*, 719 F. App'x at 928 ("The
district court correctly dismissed Myhre's complaint for lack of subject matter
jurisdiction."); *see also Kawimbe v. African Methodist Episcopal Church, Inc.*,
2021 WL 3852066, at *2-4 (N.D. Ga. Aug. 27, 2021) (evaluating the ministerial
exception under Rule 12(b)(6) and ecclesiastical abstention under Rule
12(b)(1)). Without new guidance, the Court will not deviate from the Eleventh
Circuit's long-standing practice.

Next, the Plaintiffs contend that ecclesiastical abstention does not
foreclose this action because (1) RZIM is not a church; (2) the Plaintiffs are not
members of any RZIM church; and (3) the Plaintiffs do not challenge any
ecclesiastical decisions taken by RZIM. (Pls.' Br. in Opp'n to RZIM's Mot. to
Dismiss, at 9.) The Plaintiffs miss the mark with their first point: there are
numerous cases in which non-church religious organizations were permitted
to make ecclesiastical abstention arguments. *See, e.g.*, *Puri*, 844 F.3d 1152
(religious non-profit corporation); *Garrick v. Moody Bible Inst.*, 412 F. Supp.
3d 859 (N.D. Ill. 2019) (religious educational institution); *Rymer v. Lemaster*,
2017 WL 4414163 (M.D. Tenn. Aug. 30, 2017) (private spiritual adviser). Nor
is the Court persuaded that ecclesiastical abstention turns on a person's

"membership" in a particular religious group.[3] To the contrary, the doctrine has come up in situations almost identical to this one, in which an outside donor sought a refund of misused charitable gifts from a religious non-profit group. *See Ohr Somayach/Joseph Tanenbaum Educ. Ctr. v. Farleigh Int'l Ltd.*, 483 F. Supp. 3d 195, 200-02, 204-05 (S.D.N.Y. 2020).

The Plaintiffs' third point—that this case "does not present or concern an ecclesiastical decision RZIM made and to which this Court could defer"— goes to the heart of the ecclesiastical abstention doctrine. (Pls.' Br. in Opp'n to RZIM's Mot. to Dismiss, at 14.) That is, the Court must determine whether it can resolve the Plaintiffs' claims on secular grounds without resorting to religious doctrine. As explained above, courts may draw on "neutral principles of law to decide church disputes that involve no consideration of doctrinal matters." *Myhre*, 719 F. App'x at 928 (quotation marks and alteration omitted).

> The primary advantages of the neutral-principles approach are that it is completely secular in operation, and yet flexible enough to accommodate all forms of religious organization and polity. The method relies exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges. It thereby promises to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice.

---

[3] The Plaintiffs cite just one decision from the Oklahoma Supreme Court to support that "a church's freedom from secular control is solely based on membership in the church." (Pls.' Br. in Opp'n to RZIM's Mot. to Dismiss, at 12 (quoting *Doe v. First Presbyterian Church U.S.A. of Tulsa*, 421 P.3d 284, 289 (Okla. 2017)).) Of course, this Court is not bound by pronouncements of the Oklahoma Supreme Court on First Amendment issues.

*Jones*, 443 U.S. at 603. That does not mean that a court must steer clear of all things religious when using neutral principles. Rather, a court may review "certain religious documents," such as a church constitution, while "tak[ing] special care to scrutinize the document in purely secular terms." *Id.* at 604.

As the Court reads the Complaint, the Plaintiffs' claims rest on two general categories of misrepresentations by Zacharias and RZIM. First, the Plaintiffs make "faith-based allegations"—namely that the Defendants "misrepresented that they were faith-filled Christians of upstanding moral character." (Compl. ¶¶ 68, 88.) These faith-based allegations include that

> [the] Defendants [] held themselves out to be pious followers of the Holy Gospel, maintaining a religious level of morality and following the teachings of Jesus Christ. Zacharias explicitly presented himself as a devoted Christian who was living a Christian lifestyle in keeping with the Gospel of Jesus Christ and who was worthy of leading others in their Christian faith.

(*Id.* ¶ 19.) But Zacharias, the Complaint continues, was "a serial sexual and spiritual predator and a prolific sex offender," whose "heinous acts . . . are diametrically opposed to the morality he espoused in his sermons and other public speaking engagements, are diametrically opposed to the teachings of Christianity, and are abhorred by Christian apologetics, of which he claimed to be a member and spiritual leader." (*Id.* ¶¶ 40, 52.) The Plaintiffs insist that they "would not have provided money to RZIM had they been aware of these facts and of Zacharias's moral failings." (*Id.* ¶¶ 29, 39.)

13

Second, the Plaintiffs make "misuse-of-funds allegations"—namely that the Defendants "affirmatively misrepresented that funds contributed to RZIM were to support its purported mission of Christian evangelism, apologetic defense of Christianity, and humanitarian efforts, when such funds were in fact used to support and hide Zacharias's sexual abuse." (*Id.* ¶¶ 68, 88.) The Plaintiffs allege that "RZIM funds were funneled to women subjected to Zacharias's sexual misconduct," and that "Zacharias provided money to these survivors, gave them large tips following massages, and showered them with expensive gifts." (*Id.* ¶ 50.) For example, "Touch of Hope was a discretionary fund that RZIM earmarked as a 'humanitarian effort,' but a significant portion of its wire payments were made to 'or for the benefit of' four women who were, at some point, Zacharias's massage therapists." (*Id.* (citation omitted).) All the while, Zacharias and RZIM allegedly solicited donations with the stated purpose to fund travel, training, humanitarian aid, and other expenses "to continue reaching those around the globe with the Gospel." (*Id.* ¶ 23 (citation omitted); *see also id.* ¶¶ 24, 27, 30-31, 33, 35-37.)

The Court will exercise jurisdiction over the Plaintiffs' claims to the extent they are predicated on misuse-of-funds allegations but not faith-based allegations. At bottom, the faith-based allegations ask the Court to examine the theology and customs of Christianity and Christian apologetics to determine whether Zacharias and RZIM fulfilled the religion's (and the Plaintiffs') moral standards. The Court would have to make inherently

14

ecclesiastical determinations as part of this inquiry, such as what it means to be a "faith-filled, moral, and upstanding Christian leader" (*id.* ¶ 44), and whether Zacharias's alleged sexual misconduct is "diametrically opposed to the teachings of Christianity." (*Id.* ¶ 52.) It is not the role of federal courts to answer these kinds of questions "because that would require defining the very core of what the religious body as a whole believes." *Myhre*, 719 F. App'x at 929 (alterations omitted); *see also Eglise Baptiste*, 824 F. App'x at 683 (requiring courts to refrain from matters involving "the conformity of the members of the church to the standard of morals required of them") (citation omitted). In doing so, a court risks "establishing" a religion by "putting the enforcement power of the state behind a particular religious faction." *Crowder*, 828 F.2d at 721.

On the other hand, the Court believes that the Plaintiffs' misuse-of-funds allegations do not pose the same First Amendment concerns. Those allegations, and the claims associated with them, raise what amounts to a secular factual question: whether the Defendants solicited funds for one purpose (i.e., Christian evangelism) but instead used those funds for another purpose (i.e., to perpetrate and cover up sexual abuse). That dispute "concerns the [D]efendants' actions, not their beliefs," and can be decided according to state statutes and common law principles. *Puri*, 844 F.3d at 1167 (quotation marks and alteration omitted). For example, the Charitable Solicitations Act forbids a person "[t]o misrepresent or mislead anyone in any manner to believe . . . that the proceeds of [a] solicitation or charitable sales promotion will be

used for charitable purposes if such is not the fact." O.C.G.A. § 43-17-12(d)(3). Nothing in the statute, when applied to the misuse-of-funds allegations, would require the Court to pass judgment on questions of religious faith or doctrine. The same is true of the Plaintiffs' claims for unjust enrichment and violation of the Fair Business Practices Act. Thus, the Court is satisfied that neutral principles can be used to resolve this aspect of the case.

## B. Article III Standing

Next, the Defendants argue that the Plaintiffs' unrestricted charitable gifts to RZIM cannot constitute an injury-in-fact for purposes of Article III standing. (RZIM's Br. in Supp. of RZIM's Mot. to Dismiss, at 12-15; Estate's Br. in Supp. of Estate's Mot. to Dismiss, at 16-18.) "Article III of the Constitution limits the jurisdiction of federal courts to 'cases' and 'controversies,' and standing to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Wilding*, 941 F.3d at 1124 (quotation marks omitted). The "irreducible constitutional minimum" of standing consists of three elements: "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quotation marks omitted). "[A]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support

16

the claim." *Bennett v. Spear*, 520 U.S. 154, 168 (1997) (quotation marks and alteration omitted).

The Defendants point to several out-of-circuit decisions as support that "donating money to a charitable fund does not confer standing to challenge the administration of that fund." *Pearson v. Garrett-Evangelical Theological Seminary, Inc.*, 790 F. Supp. 2d 759, 763 (N.D. Ill. 2011); *see also Orient v. Linus Pauling Inst. of Sci. & Med.*, 936 F. Supp. 704, 707 (D. Ariz. 1996) ("Funding research does not automatically confer a legally protected interest in that organization's assets on a donor, absent independent rights such as those that might arise in a contractual relationship."); *cf. Carl J. Herzog Found., Inc. v. Univ. of Bridgeport*, 699 A.2d 995, 997 (Conn. 1997) ("At common law, a donor who has made a completed charitable contribution, whether as an absolute gift or in trust, had no standing to bring an action to enforce the terms of his or her gift or trust unless he or she had expressly reserved the right to do so."). But none of the Defendants' cited authorities considered a scenario in which, like here, the plaintiff's charitable gift was allegedly obtained by fraudulent means. (*See* RZIM's Br. in Supp. of RZIM's Mot. to Dismiss, at 13-15 (collecting cases).)

By contrast, in *Wilding*, the Eleventh Circuit addressed whether donors to the Democratic National Committee and Senator Bernie Sanders's 2016 presidential campaign had standing to assert fraud, unjust enrichment, negligent misrepresentation, and other state-law claims against the DNC and

its former chairwoman. *Wilding*, 941 F.3d at 1125. The donors alleged that the Democratic Party charter requires its chairperson to remain impartial and evenhanded during the party's presidential nominating process, and that the then-DNC chairwoman and spokeswoman made public statements promising a neutral and impartial primary process. *Id.* at 1122. These statements, according to the complaint, were false: in reality, the DNC devoted considerable resources to supporting former Secretary of State Hillary Clinton above the other Democratic candidates. *Id.* Some of the named plaintiffs donated money to the DNC in 2015 and 2016 after its leaders had publicly pledged impartiality, and all of the plaintiffs who donated to the DNC or the Sanders campaign expressly alleged that they relied on the defendants' false statements and omissions. *Id.* at 1123.

The district court dismissed the plaintiffs' claims on standing grounds. *Wilding v. DNC Servs. Corp.*, 2017 WL 6345492, at *5 (S.D. Fla. Aug. 25, 2017). It held that "[t]he act of donating to an organization does not, of itself, create a legally protected interest in the organization's operations": "[j]ust as donating to Sanders's campaign would not entitle the donor to dictate the campaign's platform, donating to the DNC or to Bernie Sanders's campaign does not entitle Plaintiffs to challenge the manner in which the DNC has conducted its affairs." *Id.* Even so, the court noted that "[a] donor may suffer a cognizable injury from the violation of an independent duty, *such as if the donation was procured by fraud.*" *Id.* (emphasis added). But the plaintiffs, the court reasoned, had not

18

alleged a sufficient causal connection between the DNC's statements and their donations to confer standing for a fraud-type claim. *Id.*

The Eleventh Circuit reversed on the issue of standing. *Wilding*, 941 F.3d at 1125. With respect to the DNC donors and the Sanders donors, the court held that at least some named plaintiffs had sufficiently alleged injury-in-fact for their fraud, negligent misrepresentation, unjust enrichment, and statutory claims.

> The named plaintiffs for the DNC donor class . . . and the Sanders donor class allege that they suffered a financial loss resulting from their donations to the DNC and to the Sanders campaign. Such economic harm is a well-established injury for purposes of Article III standing. The alleged economic injury is also concrete and particularized because all named plaintiffs for the DNC donor class and the Sanders donor class alleged that they donated a specific amount of money and suffered a corresponding loss. Indeed, the complaint lists the precise dollar amount of each named plaintiff's donation(s).

*Id.* (citations omitted). The DNC donors, the court continued, had also satisfied the causation element of standing because they allegedly made direct donations to the DNC after some false statements and relied on those false statements to their detriment. *Id.* at 1126. In so holding, the court emphasized that "proximate causation is not a requirement of Article III standing, which requires only that the plaintiff's injury be *fairly traceable* to the defendant's conduct." *Id.* at 1125 (emphasis added) (alteration omitted).

Here, the Plaintiffs' allegations of injury-in-fact and causation put this case on all fours with *Wilding*. The Plaintiffs assert that they "sustained

monetary and economic injuries" arising out of their donations to RZIM. (Compl. ¶ 59.) The Carriers contributed $30,000 to RZIM on January 21, 2020, and the Nelsons contributed a total of $5,422.50 to RZIM from June 2014 to December 2020, including $1,000 in 2014 and $1,300 in 2016. (*Id.* ¶¶ 11, 13, 36.) Before making donations to RZIM, the Plaintiffs allege that they listened to radio programs, podcasts, and CDs featuring Zacharias; watched videos published by RZIM on YouTube; and/or read books by Zacharias and others within RZIM. (*Id.* ¶¶ 25-27, 30-34.) The Plaintiffs recall hearing messages during these programs and reading Giving Summaries that described RZIM's mission and evangelical efforts around the world and solicited financial contributions to advance that work. (*Id.* ¶¶ 27, 30-31, 33, 35-36.) The Plaintiffs also allege that they "reasonably relied on Zacharias's and RZIM's uniform messaging . . . that contributions made by people like the [Plaintiffs] would be used to financially support that mission." (*Id.* ¶ 38; *see also id.* ¶ 28.) Under the standard articulated in *Wilding*, the Court concludes that these allegations satisfy Article III standing's requirements at this stage of the litigation.

## C. Rule 9(b)'s Pleading Standard

Because all of the Plaintiffs' claims sound in fraud, their substantive allegations are subject not only to the plausibility criteria of *Twombly* and *Iqbal* but also to Rule 9(b)'s heightened pleading standard.[4] *See Am. Dental*

---

[4] The Plaintiffs do not contest the application of Rule 9(b) to this case and, indeed, expressly acknowledge elsewhere in the briefs that fraud is the

*Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1291 (11th Cir. 2010). Rule 9(b) provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). More specifically, "a plaintiff must allege: (1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the Plaintiffs; and (4) what the defendants gained by the alleged fraud." *Am. Dental*, 605 F.3d at 1291 (quotation marks omitted). The Defendants contend that the Complaint falls short under this standard in three ways: it fails to allege (1) any specific false statements by RZIM or Zacharias; (2) any harm to the Plaintiffs from those statements; and (3) justifiable reliance by the Plaintiffs (which is an essential element of a Fair Business Practices Act claim). (RZIM's Br. in Supp. of RZIM's Mot. to Dismiss, at 29-33; Estate's Br. in Supp. of Estate's Mot. to Dismiss, at 12-14.)

In large part, the Court disagrees with the Defendants on all three points. As laid out in the Complaint, RZIM's reported mission is "to support, expand, and enhance the preaching and teaching ministry of Ravi Zacharias . . . intended to touch both the heart and the intellect of the thinkers and opinion-makers of society with the Truth of the Gospel of Jesus Christ."

---

gravamen of their cause of action. (Pls.' Br. in Opp'n to RZIM's Mot. to Dismiss, at 28-32, 34-35; Pls.' Br. in Opp'n to Estate's Mot. to Dismiss, at 28-34.)

(Compl. ¶ 18 (citation omitted).) In widely distributed audio and video programs, RZIM and Zacharias asked supporters to donate to the organization and made particular representations (on particular dates) about how those donations were used to further RZIM's mission. (*Id.* ¶¶ 23-24, 27, 30-31, 33; *see also id.* ¶¶ 35-37.) The Plaintiffs allegedly heard some of those representations before making their donations, and "reasonably relied on Zacharias's and RZIM's uniform messaging . . . that contributions made by people like the [Plaintiffs] would be used to financially support [RZIM's] mission." (*Id.* ¶¶ 27-28, 30-31, 33, 35-36, 38.) As a result, the Plaintiffs claim "monetary and economic injuries" because they "would not have provided money to RZIM" knowing that "contributed funds were also used to further serious sexual misconduct and to cover up that misconduct." (*Id.* ¶¶ 29, 39, 59.) The Court concludes that these allegations pass muster under Rule 9(b).

This was not an easy call, though, when it comes to the Carriers. The Complaint cites just one specific request for donations which the Carriers allegedly heard during the "Let My People Think" podcast. (Compl. ¶ 27.) But that episode was released on July 4, 2020—more than five months *after* the Carriers made their first and only charitable contribution to RZIM. (*Id.* ¶¶ 11, 27.) Obviously, the Carriers could not have been misled by a future podcast episode into donating to RZIM. Even so, the Eleventh Circuit has endorsed "alternative means" to satisfy Rule 9(b). *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1371 (11th Cir. 1997). Relevant here, a complaint

may describe the nature and subject of false statements, even if it does not allege the precise words used by the defendant. *See id.* (citing *Seville Indus. Mach. Corp. v. Southmost Mach. Corp*, 742 F.2d 786, 791 (3d Cir. 1984), *abrogated in part on other grounds by Twombly*, 550 U.S. at 557. The Carriers' claims survive under this alternative standard: the Complaint alleges that they frequently listened to RZIM podcasts from early 2019 until mid-2020, and that they "recall hearing messages at the end of each podcast episode that conveyed RZIM's mission, described efforts RZIM was making to spread the Gospel around the world, and indicated that RZIM could not do its work without listeners' financial support." (Compl. ¶¶ 25, 27.)

However, the Plaintiffs have not properly pleaded any fraud stemming from RZIM's past defense and support of Zacharias. As described above, Thompson informed RZIM leadership in 2017 about Zacharias's inappropriate sexual conversations and interactions with her, including his requests for indecent photographs. (*Id.* ¶ 43.) In response, RZIM allegedly made "reckless misrepresentations in defending Zacharias against Thompson's allegations despite having been provided with 'a notebook of evidence.'" (*Id.* ¶ 44.) Those misrepresentations, the Complaint states, "allowed Zacharias to continue sexually abusing women under the cover of Christian ministry and permitted Zacharias's ongoing, deceptive fundraising efforts for RZIM." (*Id.*) The Plaintiffs claim that they made contributions to RZIM "during the time of RZIM's continued defense and support of Zacharias and Zacharias's continued

23

leadership of RZIM." (*Id.* ¶ 45.) But none of these allegations cite any statements (general or specific) made by RZIM about the Thompson incident or Zacharias's culpability at that time, nor do the Plaintiffs allege that they ever relied on any (non-existent) statements in donating to RZIM. This aspect of the Complaint does not hold up under Rule 9(b)'s pleading standard.

## D. Charitable Immunity

Next, RZIM argues that the Plaintiffs' claims—where based on negligent, and not intentional, conduct—are barred by the charitable immunity doctrine. (RZIM's Br. in Supp. of RZIM's Mot. to Dismiss, at 34-35.) In Georgia, "the general rule is that charitable trust funds are not to be depleted by subjection to liability for *negligence* . . . except where [the organization] failed to exercise ordinary care in selecting and retaining its employees and servants." *Cox v. De Jarnette*, 104 Ga. App. 664, 670 (1961) (emphasis added) (quotation marks omitted). The Plaintiffs counter that the charitable immunity doctrine has no place here because the Complaint alleges numerous intentional, fraudulent acts by RZIM and Zacharias (*e.g.*, Compl. ¶¶ 67-68, 80, 87-88, 91), as well as wrongful retention and inadequate oversight of Zacharias, RZIM's employee. (*Id.* ¶¶ 44, 50-52.) Hearing no disagreement on reply, the Court declines to extend charitable immunity to RZIM.

### E.  Statute of Limitations

The Defendants seek to dismiss most of the proposed class claims as time barred under the applicable statutes of limitations. (RZIM's Br. in Supp. of RZIM's Mot. to Dismiss, at 35-36; Estate's Br. in Supp. of Estate's Mot. to Dismiss, at 11-12.) The Plaintiffs' Charitable Solicitations Act and unjust enrichment claims are subject to a four-year statute of limitations, O.C.G.A. §§ 9-3-26, 31; *Burns v. Dees*, 252 Ga. App. 598, 607 (2001), and their Fair Business Practices Act claim carries an even shorter two-year limitations period. O.C.G.A. § 10-1-401. The proposed class spans a much longer timeframe—to include all persons in the United States who made monetary contributions to Zacharias or RZIM from 2004 through February 9, 2021. (Compl. ¶ 55.) "In cases where the gravamen of the underlying cause of action is actual fraud, 'the statute of limitations is tolled until the fraud is discovered or by reasonable diligence should have been discovered.'" *Hamburger v. PFM Cap. Mgmt., Inc.*, 286 Ga. App. 382, 388 (2007) (quoting *Shipman v. Horizon Corp.*, 245 Ga. 808, 808 (1980)). "No other independent fraudulent act is required to toll the statute," and "[s]ilence is treated as a continuation of the original actual fraud." *Shipman*, 245 Ga. at 808.

As detailed in the Complaint, the Plaintiffs' cause of action is based on fraudulent and deceptive conduct by RZIM and Zacharias in soliciting public donations. (Compl. ¶¶ 67-69, 80-81, 87-89.) The Plaintiffs claim that they "did not learn the truth about Zacharias's sexual misconduct until after RZIM

published the Miller & Martin Report on February 9, 2021." (Pls.' Br. in Opp'n to Estate's Mot. to Dismiss, at 33.) Thompson's accusations in 2017, they insist, "did not put [them] on notice, particularly in light of Zacharias's denials; his preemptive suit against the Thompsons; the Board's refusal to investigate; and the non-disclosure agreement, which ensured the Thompsons' silence." (*Id.* (citing Compl. ¶¶ 43-44; *id.*, Ex. 1 at 7).) On reply, the Defendants do not argue that the Plaintiffs could have discovered the fraud sooner by reasonable diligence; instead, they urge that "mere silence, without an intentional act to deter a plaintiff from filing a lawsuit, does not toll the statute of limitations." (Reply Br. in Supp. of Estate's Mot. to Dismiss, at 9.) But that principle, and the cases on which it relies, do not apply where fraud is the gravamen of the plaintiff's underlying case. [5] For these reasons, the Court holds that the limitations period should be tolled until February 9, 2021.

---

[5] In *Hamburger*, the Georgia Court of Appeals laid out the different standards to toll the statute of limitations "where the gravamen of the underlying cause of action is actual fraud" versus "where the gravamen of the underlying action is not a claim of fraud." 286 Ga. App. at 388 (citations omitted). In the former category of cases, "the statute of limitations is tolled until the fraud is discovered or by reasonable diligence should have been discovered. And failure to exercise reasonable diligence to discover the fraud may be excused where a relationship of trust and confidence exists between the parties." *Id.* (quotation marks, citations, and alteration omitted). In the latter category of cases,

> the statute of limitations is tolled only upon a showing of *a separate independent actual fraud* involving moral turpitude *which deters a plaintiff from filing suit*. In such cases, before the running of the limitation period will toll, *it must be shown that the defendant concealed information by an intentional act—*

## F. Unjust Enrichment (Count II)

The Court turns now to the Defendants' claim-specific arguments for dismissal, beginning with unjust enrichment. The Plaintiffs assert a claim for unjust enrichment on the grounds that it would be inequitable for the Defendants to keep donations raised on false pretenses. (Compl. ¶¶ 79-84.) The Defendants counter that "donors who make voluntary contributions are not entitled to restitution" (RZIM's Br. in Supp. of RZIM's Mot. to Dismiss, at 15; *see also* Estate's Br. in Supp. of Estate's Mot. to Dismiss, at 11), and the Estate separately argues that it cannot be liable because the Plaintiffs made donations solely to RZIM, not Zacharias or the Estate. (Estate's Br. in Supp. of Estate's Mot. to Dismiss, at 10.)

Under Georgia law, "unjust enrichment is basically an equitable doctrine that the benefitted party equitably ought to either return or

---

*something more than a mere failure, with fraudulent intent, to disclose such conduct*, unless there is on the party committing such wrong a duty to make a disclosure thereof by reason of facts and circumstances, or the existence between the parties of a confidential relationship.

*Id.* (emphasis added) (citation omitted). Neither of the Defendants' cited cases involved fraud-type claims, so the courts there applied the "independent fraud" standard and not the "reasonable diligence" standard which governs this action. *See Mayfield v. Heiman*, 317 Ga. App. 322, 322 (2012) (cause of action for breach of fiduciary duty and breach of trust); *Douglas Kohoutek, Ltd. v. Hartley, Rowe & Fowler, P.C.*, 247 Ga. App. 422, 423 (2000) (cause of action for legal malpractice based on professional negligence).

compensate for the conferred benefits when there was no legal contract to pay."

*Morris v. Britt*, 275 Ga. App. 293, 294 (2005) (citation omitted). The doctrine

> is premised upon the principle that a party cannot induce, accept, or encourage another to furnish or render something of value to such party and avoid payment for the value received; otherwise the party has been unjustly enriched at the expense of another and, in fairness and good conscience, must reimburse the other to the extent of the value conferred.

*Estate of Crook v. Foster*, 333 Ga. App. 36, 39 (2015). "For unjust enrichment to apply, the party conferring the labor and things of value must act with the expectation that the other will be responsible for the cost." *Morris*, 275 Ga. App. at 294 (quotation marks omitted). In other words, there can be no unjust enrichment "when the conferred benefit was a gift or voluntary payment." *Roberts v. Smith*, 341 Ga. App. 823, 829 (2017); *see also Estate of Crook*, 333 Ga. App. at 39-40 ("[O]ne who makes a gift or voluntarily pays money which she knows she does not owe confers a benefit, but she is not entitled to restitution.") (alterations omitted). According to the Defendants, these authorities foreclose an unjust enrichment claim based on the Plaintiffs' donations to RZIM.

But the allegations in the Complaint create a fact question about whether those donations were procured by fraud or deceit and thus should be reimbursed in fairness and good conscience. *Cf. Reynolds v. CB&T*, 342 Ga. App. 866, 873-74 (2017); *Estate of Crook*, 333 Ga. App. at 39-40. In *Reynolds*, the Georgia Court of Appeals found that a similar fact question precluded

28

summary judgment on an unjust enrichment claim. *Reynolds*, 342 Ga. App. at 873-74. There, the plaintiff sued a bank, CB&T, for wrongfully foreclosing on his property after he failed to timely repay a home construction loan. The record showed that, in the months before the foreclosure and after the loan default, CB&T had advised the plaintiff to continue building his home so that he could acquire a permanent mortgage once finished. Indeed, a CB&T employee had been working to modify the loan date when another division of the bank began foreclosure proceedings. *Id.* at 867. Thus, on the plaintiff's claim for unjust enrichment, the Georgia Court of Appeals held that "a jury could find that CB&T *encouraged* [the plaintiff] to confer a benefit upon CB&T by completing construction of the home before CB&T foreclosed." *Id.* at 874 (emphasis added).

So too here. According to the Complaint, the Defendants "induced [Plaintiffs and Class Members] to fund Defendants' purported Christian apologetic evangelism, training, and humanitarian efforts," but then "failed to use the funds for these purposes, diverting funds to massage parlors and as financial support to survivors of Zacharias's sex abuse." (Compl. ¶ 80.) The Plaintiffs allege that they would not have donated to the Defendants had the Defendants "truthfully represented that they . . . would use those financial benefits for their own, wrongful purposes, including in the furtherance of, and to hide, Zacharias's sexual misconduct." (*Id.* ¶ 81.) Taken as true, these allegations (together with the more specific facts in the Complaint) support

29

that the Defendants unfairly obtained financial benefits by misrepresenting their intended or ultimate use. *See* Restatement (Third) of Restitution & Unjust Enrichment § 13 cmt. a (Am. L. Inst. 2011) ("A conclusion that one party has obtained benefits from another by fraud is also one of the most recognizable sources of unjust enrichment.").

However, the Court finds that the Estate should be dismissed from this claim since it apparently received no donations. Though the Plaintiffs argue otherwise in their brief, the Complaint specifically alleges that the Plaintiffs made their contributions to RZIM, not Zacharias or the Estate (Compl. ¶¶ 11, 13, 29, 39; *Contra* Pls.' Br. in Opp'n to Estate's Mot. to Dismiss, at 23.) The Court does not credit contradictory, conclusory allegations that all of the "Defendants received payments in the form of charitable contributions from Plaintiffs and Class Members." (*Id.* ¶ 80); *See Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1205-06 (11th Cir. 2007) ("Our duty to accept the facts in the complaint as true does not require us to ignore specific factual details of the pleading in favor of general or conclusory allegations."). Nor is the Court persuaded, absent any supporting authority, that Zacharias is liable because he was paid as an officer and employee of RZIM from donor contributions. (*Contra* Pls.' Br. in Opp'n to Estate's Mot. to Dismiss, at 23.) If accepted, that theory would expose all RZIM employees to liability for unjust enrichment merely by accepting a paycheck.

### G. Violation of the Charitable Solicitations Act (Count I)

The Court next considers the Plaintiffs' claim under the Charitable Solicitations Act. (Compl. ¶¶ 63-78.) The Charitable Solicitations Act creates a private cause of action against a "charitable organization" or a "paid solicitor" to recover damages resulting from a violation of the statute. O.C.G.A. § 43-17-14(a). The term "charitable organization" is defined to exclude a "religious organization"—or any entity which (A) "[c]onducts regular worship services" or (B) "[i]s qualified as a religious organization under Section 501(c)(3) of the Internal Revenue Code of 1986, as now or hereafter amended, that is not required to file IRS Form 990, Return of Organization Exempt From Income Tax, under any circumstances." O.C.G.A. § 43-17-2(2), (14). The term "paid solicitor," meanwhile, is defined to exclude "[a] bona fide officer, employee, or volunteer of a charitable organization." *Id.* § 43-17-2(12)(B)(i). RZIM and the Estate contend that the "religious organization" and "bona fide officer" exceptions preclude the Plaintiffs' claim against them, respectively. (RZIM's Br. in Supp. of RZIM's Mot. to Dismiss, at 17-19; Estate's Br. in Supp. of Estate's Mot. to Dismiss, at 10.)

In support of this argument, RZIM attaches three letters from the Internal Revenue Service which purportedly "establish that RZIM is a religious organization under Section 501(c)(3) of the Internal Revenue Code

and is not required to file IRS Form 990."[6] (RZIM's Br. in Supp. of RZIM's Mot. to Dismiss, at 18.) The first letter, dated August 8, 2014, granted RZIM's request to be exempt from the requirement to file Form 990 as a "mission society." (RZIM's Br. in Supp. of RZIM's Mot. to Dismiss, Ex. A at 1.) The IRS based its decision on RZIM's tax-exempt status under Section 501(a) [7]—specifically Section 501(c)(3)—and other criteria such as "sponsor[ship] by or affiliat[ion] with one or more churches or church denominations." (*Id.*) The second letter, dated March 14, 2019, reclassified RZIM under Sections 509(a)(1) and 170(b)(1)(A)(i) as an "organization affiliated with a church or convention or association of churches," and it reaffirmed that RZIM is exempt from taxation under Section 501(c)(3) and is not required to file Form 990. (*Id.*, Ex. B at 1-2.) Finally, in a letter dated April 24, 2019, the IRS again determined that RZIM should be reclassified—this time as a "church" under Sections

---

[6] Although the IRS letters are outside the four corners of the Complaint, the Court may consider them on a motion to dismiss since they are (1) central to the Plaintiffs' claims, and (2) their authenticity is not challenged. *SFM Holding, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010). The Plaintiffs do not contest the relevance or authenticity of the letters or attempt to have them excluded on any other basis.

[7] Section 501(a) is not a separate category of tax-exempt organizations but rather a catch-all provision that includes organizations classified under Section 501(c)(3). 26 U.S.C. § 501(a) ("An organization described in subsection (c) or (d) or section 401(a) shall be exempt from taxation under this subtitle unless such exemption is denied under section 502 or 503.").

509(a)(1) and 170(b)(1)(A)(i)—while maintaining its tax-exempt status under Section 501(c)(3). (*Id.*, Ex. C at 1.)

These letters demonstrate that, since at least August 2014, RZIM has satisfied the elements of a "religious organization" under O.C.G.A. § 43-17-2(14).[8] Each one expressly states that RZIM is exempt from federal income tax under Section 501(c)(3) and is not subject to the filing requirements of Form 990. According to the Plaintiffs, though, the fact that the letters repeatedly designate RZIM a "public charity" actually reinforces that RZIM is a "charitable organization" under Georgia law. (Pls.' Br. in Opp'n to RZIM's Mot. to Dismiss, at 23.) Not so. A "public charity" (as opposed to a "private foundation") is an umbrella term under 26 U.S.C. § 509(a)(1) which encompasses several specific types of charitable organizations under 26 U.S.C.

---

[8] Although the IRS letters were addressed to Ravi Zacharias International Ministries and not RZIM Productions, the Court sees no reason to differentiate between the two organizations for purposes of this discussion. As alleged in the Complaint, RZIM Productions' purposes include "serving the needs and interests of, performing certain functions of, and otherwise carrying out the purposes of and advancing and perpetuating the ministry and missions of Ravi Zacharias International Ministries, Inc., as well as making distributions to or for the use of organizations exempt at the time under Section 501(c)(3) of the Code." (Compl. ¶ 15.) Given the supporting role RZIM Productions plays within Ravi Zacharias International Ministries, the Court is hard-pressed to imagine a scenario in which one but not the other would be considered a religious organization. Nor does the Complaint allege any other facts that distinguish the mission, work, or charitable designation of RZIM Productions from those of Ravi Zacharias International Ministries. Instead, it alleges that RZIM, collectively, "is a 'Charitable Organization' within the meaning of the Charitable Solicitations Act." (*Id.* ¶ 64.)

§ 170(b)(1)(A). As recounted above, RZIM's *specific classification* has evolved from a mission society (under Section 170(b)(1)(A)(vi)), to an organization affiliated with a church or convention or association of churches (under Section 170(b)(1)(A)(i)), to a church (under Section 170(b)(1)(A)(i)). All of these are recognized as religious organizations by the IRS.[9]

That leaves only the question of whether the Estate can be liable under the Charitable Solicitations Act when RZIM is not. In an effort to salvage this claim, the Plaintiffs contend that Zacharias was himself a "charitable organization" as defined in the statute. (Pls.' Br. in Opp'n to Estate's Mot. to Dismiss, at 20-21.) That term means, in relevant part, "any benevolent, philanthropic, patriotic, or eleemosynary . . . person . . . who solicits or obtains contributions solicited from the general public, any part of which contributions is used for charitable purposes." O.C.G.A. § 43-17-2(2). The term "person" is further defined to include an "individual." O.C.G.A. § 43-17-2(13). The Plaintiffs argue that each element of a charitable organization is alleged with respect to Zacharias: "Zacharias was an individual, who solicited funds from the general public," and "RZIM claimed contributions would be and were used

---

[9] *See, e.g.*, IRS, 2021 Instructions for Form 990 Return of Organization Exempt From Income Tax, at 4 (rev. Dec. 8, 2021), available at https://www.irs.gov/pub/irs-pdf/i990.pdf (explaining that "[c]ertain religious organizations" are not required to file Form 990 or 990-EZ, including a "church," a "convention or association or churches," and a "mission society sponsored by, or affiliated with, one or more churches or church denominations").

for charitable purposes." (Pls.' Br. in Opp'n to Estate's Mot. to Dismiss, at 21.) But in context, the Court finds that such a broad conception of a charitable organization stretches the word and the statute too far.

To begin, the statutory requirements for charitable organizations make little sense when applied to an individual like Zacharias. Take O.C.G.A. § 43-17-5 as an example. That provision requires all non-exempt charitable organizations to register with the Secretary of State before soliciting funds in the state. *Id.* § 43-17-5(b)(1). The registration statement must contain, *inter alia*, "[t]he names and addresses of officers, directors, trustees, and executive personnel" and "[t]he general purposes for which the charitable organization is organized." *Id.* § 43-17-5(b)(2). Of course, it is self-evident that Zacharias himself did not have any officers, directors, trustees, or executive personnel, nor was he organized under the laws of a state for any general purpose. Zacharias also did not solicit, as far as the Complaint alleges, any charitable contributions on his own behalf, so he could not have prepared and filed the required "financial statement of the charitable organization" with his registration. *Id.* § 43-17-5(b)(4). In Georgia, unless a statute is susceptible to only one natural and reasonable construction, "courts must construe [it] in a way that squares with common sense and sound reasoning." *Harris v. Mahone*,

340 Ga. App. 415, 421 (2017) (alteration omitted). The Plaintiffs' preferred construction would clearly do the opposite.[10]

After all, the Charitable Solicitations Act has another word to describe individuals in Zacharias's position: "executive officer." An executive officer broadly refers to

> the chief executive officer, the president, the principal financial officer, the principal operating officer, each vice president with responsibility involving policy-making functions for a significant aspect of a person's business, the secretary, the treasurer, or any other person performing similar functions with respect to any organization, whether incorporated or unincorporated.

O.C.G.A. § 43-17-2(8). The Complaint's characterization of Zacharias—as "a bona fide officer and employee of RZIM" who founded the organization in 1984 and led it since at least 2004—qualifies him as an executive officer. (Compl. ¶¶ 2, 18, 65.) While it is common sense that an officer of a charitable organization cannot also *be* the organization, other provisions of the statute confirm this distinction. For example, the definition of a "solicitor agent" excludes, on the one hand, "any person who is a charitable organization itself" (i.e., RZIM) and, on the other hand, "a bona fide officer, employee, or volunteer

---

[10] That is not to say that no individual could ever be classified as a charitable organization under the statute. Indeed, one of the exemptions to the law's registration requirement is for "[p]ersons requesting any contributions for the relief of any other individual who is specified by name at the time of the solicitation if all of the contributions collected, without any deductions whatsoever, are turned over to the named beneficiary." O.C.G.A. § 43-17-9(4). Obviously, Zacharias's alleged activities on behalf of RZIM do not fall into that category of charitable organization.

of such charitable organization" (i.e., Zacharias). O.C.G.A. § 43-17-2(16). There are similar exclusions in the definitions of "fundraising counsel," *id.* § 43-17-2(9), and "paid solicitor." *Id.* § 43-17-2(12)(B)(i).

Relatedly, the Plaintiffs' expansive interpretation of a charitable organization would make certain terms and provisions in the statute superfluous. In essence, the Plaintiffs argue that Zacharias was a charitable organization because he solicited funds from the general public under the guise of charitable activity. But the statute already contains specific regulations for "paid solicitors" and "solicitor agents," *e.g.*, O.C.G.A. §§ 43-17-3, 3.1, 8, both of which would fall into the bucket of charitable organizations under the Plaintiffs' definition. *Compare id.* §§ 43-17-2(12)(A), (16), *with id.* § 43-17-2(2). Because the General Assembly saw fit to distinguish charitable organizations from paid solicitors and solicitor agents, this Court must construe the statute "to give sensible and intelligent effect to all its provisions and to refrain from any interpretation which renders any part of the statute meaningless." *Scott v. State*, 295 Ga. 39, 40 (2014) (quotation marks omitted). The Court concludes then that Zacharias was not a charitable organization within the meaning of the Charitable Solicitations Act, and that the Plaintiffs have no right of action thereunder against the Estate.

## H.   Violation of the Fair Business Practices Act (Count III)

Finally, the Plaintiffs assert a claim under the Fair Business Practices Act on the grounds that the Defendants' charitable solicitations were unfair

and deceptive consumer practices. (Compl. ¶¶ 85-95.) The statute permits "[a]ny person who suffers injury or damages . . . as a result of consumer acts or practices in violation of this part . . . [to] bring an action individually" for damages and injunctive relief. O.C.G.A. § 10-1-399(a). The Plaintiffs do not allege (nor could they) that charitable solicitation is a "consumer act or practice" as defined in the Fair Business Practices Act. *Id.* § 10-1-392(7). Rather, their claim relies on a provision of the Charitable Solicitations Act which provides that "a solicitation shall be deemed to be a consumer act or practice or consumer transaction under" the Fair Business Practices Act. *Id.* § 43-17-19. The Defendants raise four distinct arguments in opposition to this claim.

### 1. Religious Organization Exemption

First, the Defendants argue that the Charitable Solicitations Act excludes them as a religious organization and thus cannot be used to create liability under the Fair Business Practices Act. (RZIM's Br. in Supp. of RZIM's Mot. to Dismiss, at 19-20; Estate's Br. in Supp. of Estate's Mot. to Dismiss, at 20.) But the private cause of action under the Fair Business Practices Act does not hinge on having a private cause of action under the Charitable Solicitations Act. Instead, the sole provision borrowed from the latter statute is the word "solicitation"—or, in relevant part, "the request or acceptance directly or indirectly of money . . . to be used for any charitable purpose." O.C.G.A. § 43-17-2(15). A "charitable purpose" is defined as "any charitable, benevolent,

philanthropic, patriotic, or eleemosynary purpose for religion, health, education, social welfare, arts and humanities, environment, civic, or public interest." *Id.* § 43-17-2(3). What stands out in these definitions is the lack of any exclusion for religious organizations; in fact, "religion" is expressly listed as a charitable purpose for which solicitation is allowed under the Charitable Solicitations Act. *Id.* Since there is no religious organization exclusion for solicitation in the Charitable Solicitations Act, the Defendants are not immune to a private action under the Fair Business Practices Act.

### 2. Regulatory Exemption

RZIM also claims immunity under O.C.G.A. § 10-1-396(1), which states that "[n]othing in this part shall apply to (1) [a]ctions or transactions specifically authorized under laws administered by or rules and regulations promulgated by any regulatory agency of this state or the United States." (RZIM's Br. in Supp. of RZIM's Mot. to Dismiss, at 24-27.) In RZIM's words, "[t]he donation of funds to charities and religious organizations is regulated by several different agencies which are tasked with protecting the public against the misuse and misdirection of charities and religious contributions." (*Id.* at 25.) But RZIM misunderstands the scope of the regulatory exemption: only actions or transactions which are "*specifically authorized*" under another statute or regulation are excluded from the Fair Business Practices Act. O.C.G.A. § 10-1-396(1) (emphasis added); *see also Stroman v. Bank of Am. Corp.*, 852 F. Supp. 2d 1366, 1381 (N.D. Ga. 2012). RZIM cites no authority

condoning, as the Complaint alleges, an organization to solicit donations by fraud or deceit, so the Court concludes that the regulatory exemption does not apply to this case.

### 3. Allegations of a Statutory Violation

Next, RZIM contends that the Plaintiffs have not sufficiently alleged a violation of the Fair Business Practices Act to state a claim for relief. The crux of RZIM's argument is that it cannot be liable so long as it expended *some* charitable contributions on the organization's stated mission. (RZIM's Br. in Supp. of RZIM's Mot. to Dismiss, at 21-24.) It is true that, according to the Complaint, RZIM held conferences, lectures, and seminars around the world and conducted outreach through podcast, radio, and YouTube programs. (Compl. ¶¶ 21, 25, 30-31, 34.) At the same time, the Plaintiffs allege that RZIM also funneled donations to the victims of Zacharias's sexual misconduct:

> Zacharias provided money to these survivors, gave them large tips following massages, and showered them with expensive gifts. In one instance, Zacharias paid $40,000 for a sexual abuse survivor's culinary schooling. In addition, Zacharias traveled with a personal massage therapist, whom RZIM paid. . . . Monthly financial support was also funneled through Touch of Hope. Touch of Hope was a discretionary fund that RZIM earmarked as a "humanitarian effort," but a significant portion of its wire payments were made to "or for the benefit of" four women who were, at some point, Zacharias's massage therapists.

(*Id.* ¶ 50 (citations omitted).) These allegations support that RZIM misappropriated at least some funds for purposes other than its advertised charitable mission, in violation of the Fair Business Practices Act.

Even so, the Court agrees with RZIM in one respect: the Plaintiffs' claim fails to the extent it alleges that Zacharias misused donations to finance two health spas. (*Id.* ¶ 3.) Based on the Miller & Martin Report, the first spa, Touch of Eden, was incorporated in 2004 and administratively dissolved in 2008, while the second spa, Jivan Wellness, opened at the same location in 2008, closed around 2012, and was administratively dissolved in 2015. (*Id.*, Ex. 1 at 3.) Because the Plaintiffs made the first of their donations in June 2014, the Complaint effectively concedes that their funds could not have been put toward these already closed health spas. (*Id.* ¶¶ 11, 36.) This means that, with respect to these Plaintiffs, the Defendants did not commit any deceptive consumer practices involving the use of donations on Touch of Eden or Jivan Wellness.

### 4. Duty to Disclose

To prevail on a private suit under the Fair Business Practices Act, the plaintiff must show that he "is individually injured by the breach of a duty owed to the consuming public in general." *Brown v. Morton*, 274 Ga. App. 208, 211 (2005).

> Unless it can be said that the defendant's actions had or has potential harm for the consumer public[,] the act or practice cannot be said to have "impact" on the consumer marketplace"[,] and any act or practice which is outside that context, no matter how unfair or deceptive, is not directly regulated by the [statute].

*Id.* The Complaint alleges that the Defendants had a duty to disclose "all material facts concerning [1] the sex abuse perpetrated by Zacharias and [2] the use of contributed funds because Defendants possessed exclusive

41

knowledge of those facts and intentionally concealed them from Plaintiffs and Class Members, and/or made deceptive and misleading statements contradicted by withheld facts." (Compl. ¶ 91.) RZIM counters that there are no authorities or facts in the Complaint to substantiate these duties, especially when the Miller & Martin Report "establishes" that no one within RZIM knew about Zacharias's misconduct. (RZIM's Br. in Supp. of RZIM's Mot. to Dismiss, at 27-28.)

In the Court's view, a duty to disclose Zacharias's sexual abuse is not actionable under the Fair Business Practices Act. That misconduct was a private matter which did not, on its own, deceive the Plaintiffs (or the broader public) about RZIM's mission, programs, or any other activities relevant to its charitable solicitations. Put in more doctrinal terms, Zacharias's odious behavior toward women "was not introduced into the stream of commerce[,] [n]or was it reasonably intended to impact on any 'market.'" *Larson v. Tandy Corp.*, 187 Ga. App. 893, 896 (1988); *see also Zeeman v. Black*, 156 Ga. App. 82, 83 (1980) ("[T]o be subject to direct suit under the FBPA, the alleged offender must have done some volitional act to avail himself of the channels of consumer commerce." (quotation marks omitted)). This is true even if Zacharias's actions shattered impressions of him as a "devoted Christian," and even if the Plaintiffs would not have donated to RZIM knowing of his "moral failings." (Compl. ¶¶ 19, 29, 39.) As explained above, the Court lacks

jurisdiction in any event to resolve the ecclesiastical questions intertwined with those allegations.

The Plaintiffs' claim may proceed, though, on the theory that the Defendants wrongfully failed to disclose their misuse of donor funds. RZIM's only argument on this theory is that the conclusory allegations in the Complaint, along with the Miller & Martin Report, show no knowledge by RZIM of Zacharias's sexual misconduct. (RZIM's Br. in Supp. of RZIM's Mot. to Dismiss, at 27-28.) But under Rule 9(b), a plaintiff need not "allege specific facts related to the defendant's state of mind when the allegedly fraudulent statements were made. Instead, as Rule 9(b) itself states, 'malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.'" *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008) (alteration omitted). The Complaint satisfies this pleading standard: the Defendants allegedly possessed "exclusive knowledge" about the improper use of funds and "affirmatively misrepresented" this fact when soliciting donations from the public. (Compl. ¶¶ 88-91.) In particular, the Plaintiffs allege that RZIM "steadfastly defended" Zacharias and did not investigate one of his accuser's complaints "despite having been provided with 'a notebook of evidence.'" (*Id.* ¶ 44 (citation omitted).) Although the Miller & Martin Report "did not find evidence that anyone within RZIM or on its Board knew that Mr. Zacharias had engaged in sexual misconduct," (*id.*, Ex. 1 at 2), this finding does not

establish RZIM's state of mind in the face of contrary, well-pleaded allegations. (*Contra* RZIM's Br. in Supp of RZIM's Mot. to Dismiss, at 28.)

## IV.   Conclusion

For the foregoing reasons, the Court GRANTS in part and DENIES in part Defendant Margaret Zacharias's Motion to Dismiss [Doc. 44] and Defendants Ravi Zacharias International Ministries, Inc. and RZIM Productions, Inc.'s Motion to Dismiss [Doc. 45].

SO ORDERED, this ___13th___ day of May, 2022.


_____
THOMAS W. THRASH, JR.
United States District Judge

44